GARY M RESTAINO
United States Attorney
District of Arizona
JACKSON STEPHENS
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
jackson.stephens@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | 21-CR-1720-TUC-CKJ-DTF |
| Plaintiff, | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT (ECF #15)** |
| v. | |
| Reynel Ivan Merlo-Espinal, | |
| Defendant. | |

Now comes the United States of America, by and through its undersigned attorneys, Gary M. Restaino, United States Attorney for the District of Arizona, and Jackson Stephens, Assistant United States Attorneys, and hereby submits its response to the defendant's Motion to Dismiss (ECF #15).  The Government respectfully requests that the Court deny his motion. The defendant's equal protection claim fails because Congress's plenary power over immigration affairs is subject to rational basis review. The illegal reentry law, which seeks to deter illegal immigration, passes muster. Accordingly, Merlo-Espinal's motion should be denied.

## I.      FACTUAL BACKGROUND

On June 26, 2021, the defendant was arrested in a remote area of the desert on the Organ Pipe Cactus National Monument in the state of Arizona.  The defendant admitted to the arresting Border Patrol Agent that he had entered the United States illegally three days earlier.   Further record checks using the defendants' fingerprints reflected that the defendant is a Honduran citizen who has been deported three times, most recently in 2015. There is no evidence to suggest the defendant is also a United States citizen.  A criminal records check revealed that the defendant has previously been convicted of Driving Under the Influence (2006), Unauthorized Entry of an Inhabited Dwelling (2008), Sexual Battery (2008), and Illegal Entry by a Removed Alien (2013).

## II.      SECTION 1326 DOES NOT VIOLATE EQUAL PROTECTION

The Court should deny the defendant's motion to dismiss for at least three reasons. First, immigration laws are subject to rational basis—a highly deferential standard of review—and the defendant does not even begin to overcome that standard. Section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws. Second, although the standard established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977), does not apply to immigration statutes, § 1326 passes that test because Merlo-Espinal cannot show that either the drafters of the initial statute or the drafters of its subsequent amendments were motivated by racial discrimination. Finally, the non-discriminatory reasons for adopting § 1326 are so compelling that the statute and its amendments would

have passed absent any alleged racial considerations. Therefore, Merlo-Espinal's equal protection challenge fails.

## A.    Statutory Background

This case concerns the constitutionality of the federal illegal-reentry statute, which makes it a crime when "any alien who has been," *inter alia*, "denied admission, excluded, deported, or removed . . . enters, attempts to enter,or is at any time found in, the United States," without appropriate authorization. 8 U.S.C. § 1326(a).  The base offense is punishable by a fine and up to two years'imprisonment. *Id.* Higher maximum sentences of 10 and 20 years apply if the defendant was removed after being convicted for certain crimes, depending on their nature or gravity. *Id.* § 1326(b)(1)-(4).

Section 1326 traces its roots to 1917, when Congress enacted the first criminal reentry statute. See *United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999) (1917 law was a "precursor" to § 1326). That provision made it a misdemeanor for a limited class of noncitizens deported for immoral acts to "attempt thereafter to return to or to enter the United States." Immigration Act of 1917, Pub. L. No. 64-301, § 4, 39 Stat. 874, 878-879. The following year, Congress made it a felony punishable by up to five years' imprisonment for those deported for being a member of the anarchistic and similar classes to "return to or enter the United States or attempt to" do so. Act of Oct. 16, 1918, Pub. L. No. 65-221, § 3, 40 Stat. 1012.

In cases not involving these two classes of noncitizens, however, no sanction other than repeatedly deporting illegal reentrants existed until 1929. See Pub. L. No. 64-301, § 19, 39 Stat. 889. That year, Congress passed "[a]n Act Making it a felony with penalty for

certain aliens to enter the United States of America under certain conditions in violation of law." Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 ("1929 Act").[1] Section 1(a) of the Act provided that "any alien . . . arrested and deported in pursuance of law" would "be excluded from admission to the United States" and that, "if he enters or attempts to enter the United States" thereafter, "he shall be guilty of a felony" punishable by a fine and up to two years' imprisonment. The 1929 Act responded to concerns expressed by Congress and the Department of Labor— which at the time administered the immigration laws—that the possibility of renewed deportation was insufficient to dissuade those who had been removed from returning and that criminal penalties were therefore needed as an added deterrent. See S. Rep. No. 70-1456, at 1-2 (Jan. 17, 1929); H.R. Rep. No. 70-2418, at 6 (Feb. 7, 1929).

Congress revisited the criminal reentry statute 23 years later as part of the Immigration and Nationality Act of 1952 (INA), Pub. L. No. 82-414, 66 Stat. 163. The INA "represents the final product of a most intensive and searching investigation and study over a three[-]year period." *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968). Congress had authorized the Senate Judiciary Committee "to make a full and

---

[1] The 1929 Act was *not* titled "the Undesirable Aliens Act," as Carrillo asserted and the district court stated. 1-ER-7 & n.9; 4-ER-557, 572, 578. [should we have ER cites here?] A moreexpansive bill bearing that name was introduced in the House. *See* H.R. Rep. No. 70-2418, at 12 (Feb. 7, 1929) (Sec. 10); 70 Cong. Rec. 3542 (Feb. 15, 1929).But the Senate rejected several portions of that proposal, including its title.  *See* E.P. Hutchinson, *Legislative History of American Immigration Policy, 1798-1965*, pp.209-10 (1981). And the House ultimately relented. *See* 70 Cong. Rec. 4952 (Mar. 1, 1929) (explaining the development of the Act and "[t]hat the House recede[d] from its amendment to the title of the bill").

complete investigation of our entire immigration system" and to provide "recommendations for changes in the immigration and naturalization laws as it may deem advisable." S. Rep. No. 81-1515, at 803 (1950). As relevant here, the Committee's resulting 925-page report described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area." Id. at 654-55. It also noted that existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor." *Id.* at 655.

Congress responded with Section 276 of the INA, codified as Section 1326. In line with the Judiciary Committee's recommendation, the INA eliminated the disparate penalties applicable to reentry defendants depending on the basis for their deportation, creating instead a single offense that subjected all reentry defendants to the same penalties as the 1929 Act: two years' imprisonment and a fine. Pub. L. No. 82-414, § 276, 66 Stat. 230; *see United States v. Mendoza-Lopez*, 481 U.S. 828, 835-36 (1987). The statute also sought to offset some difficulties in enforcing prior statutes by adding a new basis for liability: "being 'found in' the United States" after a prior deportation, a "continuing" offense that "commences with the illegal entry, but is not completed until" the defendant is discovered. *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000) (*quoting* 8 U.S.C. § 1326(a)(2)).

Section 1326 has been amended on several occasions since 1952, often with an eye toward increasing its deterrent effect.  In 1988, Congress enacted what is now § 1326(b) to

prescribe enhanced penalties for defendants with prior felony convictions. Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (1988); *see Almendarez-Torres v. United States*, 523 U.S. 224, 229 (1998). Congress increased the applicable fines two years later in the Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059, and again upped the penalties in the Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023. In 1996, Congress enacted § 1326(d) in response to the Supreme Court's decision in *Mendoza-Lopez,* which had held that the statute may violate due process absent an opportunity for the defendant to challenge the validity of the prior removal order. 481 U.S. at 830; Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279. Later that year, Congress updated § 1326 to add a new penalty provision, to expand the class of prosecutable defendants to include those who "ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding," and to align the statute with other changes to immigration law enacted in 1996. Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-606, 3009-618 to 3009-620 3009-629.

**B.      Section 1326 Is Constitutional Under Rational Basis Review.**

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court called Congress's inherent immigration power "plenary"; the Ninth Circuit deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree

that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976)); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

As a result, federal immigration laws are an exception to the general rule that distinctions based on citizenship are subject to heightened scrutiny. *See Hamp-ton v. Wong*, 426 U.S. 88, 100 (1976). The "deferential standard of review" afforded to federal immigration laws is limited to considering whether the law is "facially legitimate and bona fide," *Mandel*, 408 U.S. at 769, and it applies equally to congressional decision-making, *Fiallo*, 430 U.S. at 795. *See id.* at 799 (rejecting equal protection challenge to congressional law giving immigration preferences to mothers of illegitimate children because the issue was "solely for the responsibility of the Congress and wholly outside the power of this Court to control"). In the Ninth Circuit, *Mandel*/*Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and

finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[2]

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320). Indeed, "[t]he rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the

---

[2] In a concurring opinion in *Ledezma-Cosino*, three judges presented their view, citing *Mandel/Fiallo*, that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring).

governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

Section 1326 more than survives rational basis review.  The government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and § 1326, which criminalizes—and thereby deters—illegal reentry. *See, e.g.*, *Hernandez-Guerrero*, 147 F.3d at 1078 ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."). Indeed, because § 1326's "clear purpose is to deter aliens who have been forced to leave the United States from reentering the United States, § 1326 is well within the ambit of Congress's sweeping power over immigration matters." *Id.* (citations and formatting omitted).

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (citing *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with Section 1326, which seeks to deter all aliens from illegally entering the United States, particularly after they have already been subjected to an order of removal. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272

(1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."). Section 1326 easily passes the rational basis test and does not violate the equal protection clause.

The Ninth Circuit recently had the opportunity to deviate from longstanding precedent on the constitutionality of federal immigration statutes and declined to do so in a published decision, *United States v. Ayala-Bello*. In that case, the Court applied the rational basis test and affirmed the lower court's dismissal of defendants' claim that their prosecution for illegal entry on the normal criminal docket violated their right to equal protection because they ought to have been prosecuted through the Central Violations Bureau (CVB). No. 19-50366, 2021 WL 1605990, at *1 (9th Cir. Apr. 26, 2021). Therein, the Court noted "immigration is a federal matter," *id.* at 3, and the government has "a legitimate interest in controlling our borders." *Id.* at 4 (citing *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)). In sum, the constitutionality of 8 U.S.C. § 1326 has long been upheld by the courts, and even in the specific context Merlo-Espinal challenges it today, the statute readily and easily withstands scrutiny under the rational basis test.

Finally, the Ninth Circuit has upheld both the constitutionality of 8 U.S.C. § 1326, and the counterpart illegal entry violation under 8 U.S.C. § 1325, in a variety of other contexts. See, e.g., *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1072–73 (9th Cir. 2005) ("Section 1326 does not violate the rule of *Apprendi*, which requires that 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.'") (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *United States v. Lara-Aceves*, 183 F.3d 1007 (9th Cir.

10

1999), cert. denied, 528 U.S. 1095 (2000) and overruled on other grounds by *United States v. Rivera-Sanchez*, 247 F.3d 905 (9th Cir. 2001) (holding § 1326 did not violate constitutional due process by relying on the administrative adjudication of removal proceedings as an element of the criminal offense); *United States v. Soto-Tafolla*, 156 F.3d 1241 (9th Cir. 1998) (unpublished) (holding section 1326 is not unconstitutionally vague, because the statute clearly states that "a deported person who reenters the country without permission at any time has committed a felony").

**C.    As An Immigration Statute, § 1326 Is Not Subject To The *Arlington Heights* Standard.**

As Merlo-Espinal acknowledges by implication, § 1326 is neutral on its face. Despite this, he argues that § 1326 is subject to strict scrutiny under *Arlington Heights*, because the statute was enacted with a discriminatory purpose. (ECF #15, at 3.)  He is wrong. In *Arlington Heights*, the Supreme Court rejected an Equal Protection challenge to a zoning ordinance on review of whether "a discriminatory purpose" was "a motivating factor in the decision."[3] *Id.* at 265–66. That inquiry requires courts to probe into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." *Id.* at 267-68.

Merlo-Espinal's precise argument has been consistently struck down in several courts within the Ninth Circuit. In *United States v. Lucas-Hernandez*, the court denied a

---

[3] *Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing, "which would probably be racially integrated." *Id.* at 258. In other words, it is far from the circumstance here involving the plenary power of Congress over immigration affairs.

defendant's virtually identical argument made in the 8 U.S.C. § 1325 illegal entry context. No. 19-MJ-24522-LL, 2020 WL 6161150 (S.D. Cal. Oct. 21, 2020). In so doing, the court found defendant's Arlington Heights analysis was "fatally flawed," and Ramos and Espinoza were inapplicable. *Id*. at 2.

**D.    Even If *Arlington Heights* Applies, § 1326 Is Constitutional.**

Under the Arlington Heights framework, a defendant bears the burden of "proving that discriminatory purpose was a motivating factor in" the enactment of the legislation. 429 U.S. at 270. But even if he succeeds, a court should not invalidate the legislation if the Government can show "that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 271 n.21; *see Hunter v. Underwood*, 471 U.S. 222, 225 (1985).  Not only has Merlo-Espinal failed to show a discriminatory purpose, but Congress would have adopted § 1326 absent any supposed consideration of race.

**1.    Merlo-Espinal Cannot Show That Racial Discrimination Was A Motivating Factor In The Passage Of § 1326 And Its Amendments.**

To establish a discriminatory motive, the defendant must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. That standard requires more than proof that the legislature had "awareness of [the] consequences" for the affected group, that those consequences were "foreseeable," *id.* at 278-79, or that it acted "with indifference to" the effect on that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020).

The original 1917 law already made it a misdemeanor or felony for certain groups of immigrants to reenter after deportation (Immigration Act of 1917, Pub. L. No. 64-301, § 4, 39 Stat. 874, 878-879; Act of Oct. 16, 1918, Pub. L. No. 65-221, § 3, 40 Stat. 1012).

The 1929 Act Adopted a general penalty for illegal reentry in order to respond to concerns that the existing framework was insufficient to dissuade removed individuals from attempting to reenter. (S. Rep. No. 70-1456, at 1-2 (Jan. 17, 1929); H.R. Rep. No. 70-2418, at 6 (Feb. 7, 1929).)  The Senate Report preceding the 1929 Act quotes Department of Labor submissions explaining that existing law provided no penalty, "other than repeated deportation," for most of the reentering noncitizens, and called it "academic that no prohibitive law can successfully be enforced without a deterrent penalty." S. Rep. No. 70-1456, at 1-2.

The 1952 INA illegal reentry provisions were uncontroversial. The competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic, see, e.g., 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman)—contained an illegal-reentry law identical to what became Section 1326. See S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952).

§ 1326 also substantially altered the 1929 law.  First, Congress added the "found in" clause now in Section 1326(a), creating a "substantive offense[]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. See *United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999).

Second, Congress enacted Section 1326 to serve as a single illegal-reentry statute that applied the same penalties to all defendants, repealing other provisions that had

prescribed different penalties for defendants deported for subversive or immoral activities. See INA § 403, 66 Stat. 279-80; S. Rep. No. 81-1515, at 646-47, 655-56 (1950); *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 & n.10 (1987). (p.45)

Third, Section 1326's text reflects additional relevant changes from the 1929 Act. Congress (1) expanded the prohibition to reach those "excluded and deported," not just those "arrested and deported," INA § 276, 66 Stat. 229; and (2) omitted a phrase in the 1929 Act ("in pursuance of law") that the Supreme Court later identified as a potential textual basis for allowing defendants to challenge the validity of their deportation orders in the illegal-reentry prosecution. See *United States v. Mendoza-Lopez*, 481 U.S. 828, 836 (1987); see also *id*. at 831 n.2 (noting the language in Section 1326, added in 1952, that "excepts those aliens who have either received the express consent of the Attorney General to reapply for admission or who otherwise establish that they were not required to obtain such consent").

**2.    Even If Underpinnings of the 1929 Act Were Racist, They Do Not "Forever Taint" Future Immigration Legislation.**

Under Merlo-Espinal's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Even assuming intentional discrimination existed in 1920s legislation (discussed earlier), this is a question about the motives of the legislature at that time. Legislative intent is not an artifact that "carr[ies] over" from one law to the next; it must be decided anew with each successive enactment. *See, e.g.*, *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (inquiring "whether

a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot . . . condemn governmental action that is not itself unlawful"); *cf. Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (contemplating that a law invalidated because of improper motive might "be valid" if the legislature "repassed it for different reasons").

Moreover, Merlo-Espinal's perspective that the 1920's immigration laws were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. See Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. See U.S. Dep't of State, Office of the Historian, The Immigration Act of 1924 (The Johnson-Reed Act), https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with Merlo-Espinal's view that Congress was developing legislation with the intent and purpose of discriminating against persons from Mexico.

Relatedly, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind

a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.*

The cases Merlo-Espinal relies on for his "forever tainted" argument do not support it. In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment, as incorporated against the states, requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment, e.g., that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Merlo-Espinal's characterization of *Ramos* is that the Court's discussion of the racial underpinnings of the state law drove the outcome. Instead, as the majority acknowledged, it was entirely superfluous. In any event, *Ramos* has no

16

applicability here because it does not involve immigration law and the concomitant deferential standard of review.

Likewise, *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The provision was not found unconstitutional because of any "checkered tradition," as Merlo-Espinal suggests. (ECF No. 74 at 15.) That phrase appears briefly in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In sum, neither *Ramos* nor *Espinoza* stands for the proposition Merlo-Espinal claims—that "not only do courts examine the racial motivations of a law at the time of its passage, but later reenactments do also not cleanse the law of its original taint." (ECF No. 15 at 19.)

As a final example of Merlo-Espinal's erroneous original taint argument, several courts of appeals have recognized that, when a State reenacts a particular voting provision that was intentionally discriminatory when first enacted, the ultimate focus in any subsequent litigation must be the intent of the reenacting legislature, not the original one.

*See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir. 2005) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (reaffirming that plaintiff was required to show that the "*current* version" of the law was "adopted out of a desire to discriminate") (emphasis added).

Moreover, Merlo-Espinal is wrong to claim that § 1326 continues to bear the taint of racial discrimination because it disproportionately affects Mexican and Latinx individuals. (ECF #15, at 20.) Higher percentages of Mexican and other Latinx defendants prosecuted for 8 U.S.C. § 1326 violations are because of Mexico's—and other Latin American countries'—proximity to the southern border. While Merlo-Espinal cites the higher percentage of arrests of Mexican and Latinx defendants as proof of disparate impact and discrimination, it is not. Those numbers are a product of geography. For instance, in FY20, Border Patrol encountered 405,036 total encounters, and to date in FY21, Border Patrol has encountered 726,401 individuals. *See* U.S. Customs & Border Prot., CBP Enforcement Statistics Fiscal Year 2021, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. In FY 2020, 99% of these encounters (400,651) occurred on the southwest border. *See* U.S. Customs & Border Prot., Southwest Border Migration FY 2020, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2020. These numbers are

consistent with the U.S. Sentencing Commission's most recent data on prosecutions for illegal reentry statistics from FY19. *See* U.S. Sent. Comm'm, <u>Quick Facts: Illegal Reentry Offenses</u>, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf. In sum, these numbers are neither surprising nor illuminating of Congress's motives in the 1920's.[4]

Thus, Merlo-Espinal's cited statistics are a product of geography, not disparate impact or purposeful discrimination. This alone is sufficient to reject his *Arlington Heights* analysis. *See, e.g.*, ECF No. 74 at 15-16 (admitting that *Arlington Heights* requires Merlo-Espinal to establish that a law "disparately impacts a particular group"); *Regents of the Univ. of California*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds"). Finally, Further, the court found the defendant did not show racial discrimination with statistics of disparate impact because "impact is more readily explained by the geographic proximity of the border to Mexico and Latin America than by animus." *United States v. Lucas-Hernandez* at 3. Finally, the court agreed that rational basis review

---

[4] Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—to include those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (plurality opinion) (finding that the disparate impact of DACA rescission on Latinos from Mexico—totaling 78% of DACA recipients—did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted).

was the appropriate level of scrutiny and found 8 U.S.C. § 1325(a)(1) to have satisfied that test because the government has a "legitimate interest in deterring illegal entry." See Id. at 3-4 (citing Hernandez-Guerrero, 147 F.3d at 1078). The above discussion and bases were also used to deny virtually identical challenges in United States v. Lazcano-Neria and United States v. Morales-Roblero. See Lazcano-Neria, No. 3:20-MJ-04538-AHG, 2020 WL 6363685, at *6 (S.D. Cal. Oct. 29, 2020); Morales-Roblero, No. 3:19-MJ-24442-AHG, 2020 WL 5517594, at *7–10 (S.D. Cal. Sept. 14, 2020).

### 3.    Congress Would Have Passed § 1326 And Its Amendments Absent Any Alleged Consideration Of Race.

Even if Congress had impermissibly considered race when adopting § 1326, the statute is not unconstitutional under *Arlington Heights* because Congress would have passed the statute even absent its alleged consideration of race. *See Arlington Heights*, 429 U.S. at 270 n.21.[5]

"[C]ontrol[ling] unlawful immigration … is a normal regulatory function of the sovereign." Indeed, the Ninth Circuit has rejected just this sort of statistics-based

---

[5] In any event, given Congress' plenary authority over immigration, § 1326 would satisfy strict scrutiny. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1326, applicable to any alien who unlawfully enters the United States after a prior removal, achieves that interest in the most possible tailored way.

argument in the context of affirming the denial of a motion to compel discovery with regards to a selective prosecution claim. As it held:

> Sullivan's proposition is that selective prosecution may be inferred because 94.5% of § 1326 defendants are Hispanic males, while only 89% of persons deported from the United States are Hispanic. This statistic is probative of the treatment of similarly situated individuals only if one assumes that deported individuals of different ethnic origins return to the United States at relatively equal rates, and therefore that Hispanics comprise 89% of individuals illegally re-entering the United States. As the district court aptly noted, however, common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so.
>
> *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003).

The Fourth Circuit has rejected a similar line of attack. See *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (declining invitation to reconsider the constitutionality of 21 U.S.C. § 841(b) "in light of a 1995 report by the United States Sentencing Commission showing that over eighty percent of those convicted for cocaine base trafficking or possession are black" and holding that "[t]he fact that the statute does not have a uniform racial impact, however, is not enough to establish an equal protection violation."); *see also United States v. D'Anjou*, 16 F.3d 604, 612 (4th Cir. 1994) ("In this instance, there is evidence that the line Congress and the Sentencing Commission have drawn has a disproportionate impact upon blacks. But this is not sufficient to make out an Equal Protection Violation."). And of course, these holdings are in accord with longstanding Supreme Court precedent, including *Arlington Heights*, which itself stated that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65; *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based,

uneven effects upon particular groups within a class are ordinarily of no constitutional concern."); *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another."). *Rizo-Rizo*, 2021 WL 5024364, at *4.

And imposing a sanction on those who repeatedly violate U.S. immigration laws (and territorial boundaries) is a basic feature of a controlled border. That is why this Court described § 1326 as "a *necessary piece* of the immigration-regulation framework," without which "Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078 (emphasis added). It is also why many countries criminalize unlawful entry and reentry in some form. THE L. LIBR. OF CONG., GLOB. LEGAL RSCH. DIRECTORATE, CRIMINALIZATION OF ILLEGAL ENTRY AROUND THE WORLD 1 (2019), https://tile.loc.gov/storage-services/service/ll/llglrd/2019685473/2019685473.pdf (noting that "162 countries that have laws criminalizing or otherwise punishing illegal entry," that "124 countries that treat illegal entry as a crime," and that "criminal sanctions may apply if aggravating circumstances are present" in countries that treat illegal entry as a civil matter).

*Hernandez-Guerrero*'s rationale tracks the reasons actually given when Congress passed Section 1326's predecessor. The Senate Report preceding the 1929 Act quotes Department of Labor submissions explaining that existing law provided

no penalty, "other than repeated deportation," for most of the reentering noncitizens, and calling it "academic that no prohibitive law can successfully be enforced without a deterrent penalty." S. Rep. No. 70-1456, at 1-2.

To the extent that Congress's motives in 1929 carried over to 1952, these non-discriminatory concerns explained Congress's reasons for the 1952 legislation as well. The need for a deterrent penalty would have been especially obvious (and important) to Congress given the post-1929 historical developments. As one subcommittee report explained, Mexico was "increasingly concerned about the continuing high level of illegal immigration, which it viewed as something of a diplomatic embarrassment." CONG. RSCH. SERVS., U.S. IMMIGRATION LAW AND POLICY: 1952-1986: A REPORT PREPARED FOR THE USE OF THE SUBCOMMITTEE ON IMMIGRATION AND REFUGEE AFFAIRS 35, (Comm. Print 1987). As one senator explained during a debate in 1952, "[t]he Mexican government refuse[d] to enter into another [labor agreement] . . . unless [the United States] strengthen[d] [its] immigration laws." 98 Cong. Rec. 795 (Sen. Ellender). It is implausible to conclude that Congress, faced with that landscape, would have forgone an illegal-reentry law and accepted a return to the situation described in the 1929 Senate Report—or that it would have insisted on passing such a law solely because of a desire to discriminate against Mexican and Latinx persons.

More fundamentally, the repeated amendments to § 1326 since 1952 obviate any need to speculate about whether Congress would have enacted the statute absent discriminatory motives. Congress has revisited § 1326 five times—in 1988, 1990, 1994, and twice in 1996. *See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996); Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996); Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994); Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990); Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988). Merlo-Espinal has not alleged, and the district court did not find, that *any* of these amendments was motivated by discriminatory intent. And the fact that Congress has repeatedly expanded Section 1326's scope or penalties without any evidence of discriminatory intent indicates that the law would have passed in the first instance absent any impermissible motive.

The 1990 amendment is particularly illustrative of Congress's efforts to increase Section 1326's deterrent value in legislation that lacks any hint of racial animus. That Act authorized greater fines for § 1326 violations. Pub. L. No. 101-649, § 543, 104 Stat. 5059. Yet in the same Act, Congress more than doubled the then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to

increase the number of visas provided to countries that were underrepresented in admission to the United States. Pub. L. No. 101-649, §§ 131, 303, 104 Stat. 4997-99, 5036-37. That § 1326 was amended as part of legislation that marks "an about face away from the racist trope that accompanied" earlier immigration laws, *United States v. Gallegos-Aparicio*, No. 19-cr-2637, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020), confirms that Congress viewed the statute as an important deterrence measure separate and apart from any discriminatory motive. The decision to alter a statute's maximum penalties and penalty structure necessarily means that Congress has evaluated existing policy, decided it does not strike the right balance, and altered that balance. *See United States v. Suquilanda*, No. 21-cr-263, 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021) (post-1952 amendments have served "to enhance penalties or otherwise rebalance the deterrent effect of the law").

These independent, non-discriminatory reasons for the adoption of § 1326 means that Merlo-Espinal cannot "fairly . . . attribute" the passage of the statute to "a discriminatory purpose," and thus there is "no justification for judicial interference." *Arlington Heights*, 429 U.S. at 271 n.21.

## III.   CONCLUSION

Based on the above, the government respectfully requests that the Court deny Merlo-Espinal's motion, because he cannot show an equal protection violation.  Finally, there is no need for an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But his claim fails for many reasons besides *Arlington Heights*. There is therefore

no reason to hold an evidentiary hearing. See, e.g., *United States v. Irwin*, 612 F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

Respectfully submitted this 17th day of January, 2021.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Jackson A. Stephens*
JACKSON STEPHENS
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of January, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

All ECF Participants