JON M. SANDS
Federal Public Defender
**JORDAN PERRY MALKA**
IL State Bar No. 6321055
Jordan_Malka@fd.org
*Attorney for Defendant*
407 W. Congress St., Suite 501
Tucson, AZ  85701
Telephone:  (520) 879-7500

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR21-1720-TUC-CKJ (DTF) |
|---|---|
| Plaintiff, | **Reply to Government's Response (doc. 24) to Defense's Motion to Dismiss the Indictment (doc. 15)** |
| vs. | |
| Reynel Ivan Merlo-Espinal, | |
| Defendant. | |

### I.   Introduction

The government's response does not genuinely refute that discrimination was a *motivating factor* in Congress's criminalization of illegal re-entry. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  The government also disregards the expert opinions of immigration historians, both of whom supplied this Court with declarations graphically explaining that a racist spirit existed amongst many powerful lawmakers when 8 U.S.C. § 1326 was created in 1929. The government has ultimately failed to acknowledge that Congress passed this law because they wished to keep the "rat man" out of the American gene pool pool[1]; "protect[] [the] American racial stock from further degradation or change through mongrelization"[2]; avoid

---

[1] Hans P. Vought, The Bully Pulpit, 174–75 (2004) (statement of Secretary of Labor James Davis).
[2] Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration," Congressional Record, (Feb. 9, 1928) pp. H2817–18.

"poisoning the American citizen"[3]; and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."[4]

The government also invites the Court to apply a conceptual framework at odds with controlling precedent, asserting that Congress can pass racially animated domestic criminal laws so long as they are rationally related to regulating immigration. Not only does no controlling authority support this striking proposition – which would justify overtly racialized criminal punishment for immigrants within our borders – but the entire history of equal-protection law teaches that, even in areas of apex deference, race discrimination requires exacting judicial scrutiny.

The government further argues that Congress's original decision to criminalize illegal reentry is irrelevant because, even if the 1929 Act was improperly motivated, the reenactment of that law in the Immigration and Nationality Act of 1952 removed its racist origins. But the government has not come close to showing that, through the 1952 Act, Congress reckoned with the 1929 Act's discriminatory inception. Nor could it. Rather than grappling with the law's foundation, Congress explicitly decided to "carr[y] forward" and "substantially reenact[]" the 1929 law into the 1952 Act. Under longstanding Supreme Court precedent, such pro forma recodifications do not detach a law from its original intent.

Ultimately, the government is reduced to making the circular argument that, because enforcement efforts have continued to overwhelmingly target Mexicans, Latinos, and the southern border, the law's disparate effect is simply a product of geography. But all that *Arlington Heights* requires is that the law continue to "bear more heavily[]" on Mexicans and Latinos. Given the overwhelmingly lopsided statistics, that can hardly be disputed.

For the reasons above and below, the Court should find that § 1326 violates equal protection under *Arlington Heights*, or, at a minimum, hold a hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

---

[3] Exhibit C, Representative Fitzgerald, "Deportation of Aliens." Congressional Record (1929) p. H3620
[4] Exhibit G, Hearings Before the Committee on Immigration and Naturalization, 69th Cong. 69.1.3 (1926)

## II. Reply

The government is wrong – *Arlington Heights* applies here. Greater protections are afforded under the Fifth Amendment when the government seeks to "punish[] by deprivation of liberty and property. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). Further, the government's argument that 8 U.S.C. § 1326, a criminal law enacted by Congress, should be found free from constitutional equal protection constraints because the offense relates to immigration is unpersuasive. The Ninth Circuit Court of Appeals and a plurality of the United States Supreme Court declined to adopt the standard advanced by the government in race-based equal protection challenges of immigration decisions by the executive, and instead applied *Arlington Heights*. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518-20 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020)); *see also Ramos v. Wolf*, 975 F.3d 872, 896- 99 (9th Cir. 2020) (declining to apply a more deferential standard in favor of *Arlington Heights*).

In both *Regents* and *Wolf*, the Ninth Circuit distinguished *Trump v. Hawaii*, 138 S. Ct. 2392 (2019), where the Court applied a more deferential standard to an establishment clause challenge of an executive order concerning immigration. Specifically, the Ninth Circuit found that the standard applied in *Trump* did not similarly apply to equal protection challenges because it differed "in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, the lack of national security justification for the challenged government action, and the nature of the constitutional claim raised." *Regents*, 908 F.3d at 520; *see also Wolf*, 975 F.3d at 895 ("[T]he deferential standard of review applied in *Trump v. Hawaii* turned primarily on the Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference.").

The Ninth Circuit recognized a difference between situations that invoke the President's expansive executive authority "to respond to changing world conditions" in matters of national security and the Court's mandate to ensure all people are afforded equal protection under the law. *See Wolf*, 975 F.3d at 896 (quoting *Trump*, 138 S. Ct. at 2419). Here, Mr. Merlo-Espinal is simply challenging a criminal law—which goes to the "nature" of the Fifth Amendment's protective concern—applicable to those within the United States, rather than an immigration policy addressing national security concerns of those not within the United States; as such, his equal protection challenge should be reviewed under a more heightened standard than the rational-basis standard that the government proposed.

The government argues that, even if *Arlington Heights* applied, 8 U.S.C. § 1326 is still constitutional because race was not a motivating factor in § 1326's passage. They further attribute 8 U.S.C. § 1326's disparate impact on Mexican and Latinx defendants because of the United States' geographic location to Mexico and Central America. Lastly, the government states that § 1326's reenactment in 1952 cleanses the law of any prior discriminatory motivation initially present during its first passage. Again, they are wrong on all three accounts.

The test for disparate impact only requires evidence that § 1326 "bear more heavily on one race than another," a much less stringent standard than the government suggests. *Arlington Heights*, 429 U.S. at 266. Additionally, the government's point that § 1326 has been used to incarcerate the Latinx community at a much higher rate than other communities simply because of the United States' geographic location to Mexico and Central America is concerning. The over policing of the southern border (as opposed to the northern border with Canada) should not prevent a specific group of individuals from raising equal protection challenges. Moreover, under *Arlington Heights*, it is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it does overwhelmingly impact Mexican and Latino communities today.

Plus, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly- or trending-Latino neighborhoods have disparate impacts on Latino people, *The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704-06 (9th Cir. 2009); that educational decisions made with a racist purpose in a predominantly Latino city have a disparate impact on Latino students, *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015); and that voting decisions made with a racist purpose in a state where some American Indian, Latino, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities, *D.N.C. v. Hobbs*, 948 F.3d 989, 1004-06 (9th Cir. 2020) (en banc). If the government's "geography" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

Moreover, pro forma reenactments have not cleansed § 1326 of its racist origins. First, Congress never repudiated the racial animus that led to the adoption of § 1326 in 1952 when the statute was reenacted. Congress not only remained silent on the issue in 1952, but, as the government correctly noted, they used the opportunity to recodify § 1326 with more punitive measures. Second, and as noted in the defense's initial motion to dismiss, two Supreme Court decisions held that reenacting a law passed with discriminatory purpose does not cleanse the law of that purpose. The majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that in "assess[ing] the functional benefits" of a law, courts cannot "ignore the very functions those rules were" – at inception – "adopted to serve." 140 S. Ct. 1390, 1401 & n.44 (2020). Then, in *Espinoza v. Montana Dep't of Revenue*, the majority relied on a law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). Concurring, Justice Alito noted that "because I lost, and *Ramos* is now precedent," the Court could

examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted).

In arguing that the legislative intent underlying the 1929 Act is irrelevant to its pro forma reenactment in the 1950s, the government simply ignores the teaching of *Ramos* and *Espinoza*, instead citing cases supporting the proposition that, in some circumstances, later reenactments may cleanse a law of its original taint. But the statements in *Ramos* and *Espinoza* must not be ignored. First, they limn an approach that is, in the words of Justice Alito, "now precedent." *Espinoza*, 140 S. Ct. at 2259. Second, even if the Court were inclined to view these comments as dicta, "lower courts are advised to follow the Supreme Court's considered dicta." *Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072, 1079 & n.5 (9th Cir. 2020). In fact, courts must accord it "great weight." *Coeur d'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004). Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392– 1420; *Espinoza*, 140 S. Ct. at 2268. On the scale of prophetic dicta, this endorsement during the Court's most recent term rates exceptionally high.

Nor can *Ramos* and *Espinoza* be distinguished and confined in the ad hoc way the government offers up. The government says *Ramos*'s analysis is confined to the Sixth Amendment context – and that immigration laws warrant different treatment – but it gives no principled reason to think that this is true. Moreover, illegal reentry isn't an immigration law; it is a domestic criminal statute, exactly like the statute at issue in *Ramos*. The government's attempt to distinguish *Ramos* accordingly fails. Its attempt to explain away *Espinoza* fails even harder. Espinoza stands – precisely – for the proposition that a law's "checkered history" of discriminatory religious intent will not be cleansed by reenactment. It examined history to determine whether a reenacted statute was still infected with its predecessor's discriminatory intent. That is exactly what Mr. Merlo-Espinal asks the Court to do here.

And it's not as if this general principle is of recent vintage. In fact, its provenance stretches back over 100 years. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1 (1896), for example, the Supreme Court explained that a statutory repeal and recodification has no impact on the intended effect of the substantive provisions that remain the same:

> Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the act of 1888 when these similar provisions have not been in force. Notwithstanding, therefore, this formal repeal, it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act.

164 U.S. at 11-12 (citing *Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985), the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act. The upshot of these decisions is that "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29.

Here, the government has not shown that Congress meaningfully reevaluated the illegal reentry statute when enacting the 1952 Act. Nor could it. Although, as the government notes, the 1952 Act was designed to reorganize the nation's immigration laws, Congress explicitly decided that "the present Act of March 4, 1929 should be reenacted" within the new INA. S. Rep. No. 81-1515, at 655 (1950), reprinted in Trelles, Oscar &

James F. Bailey, Immigration and Nationality Acts: Legislative Histories and Related Documents 1950-1978. Explicitly recodifying the same offense, on the same terms, with substantially the same language is a no way to mark a change. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997).

### III. CONCLUSION

Ultimately, requiring legislative bodies to reevaluate laws previously passed with prohibited intent serves the critical purpose of preventing the unlawful vestiges of the past from moving silently into the present merely through inertia and the passage of time. *See United States v. Fordice*, 505 U.S. 717, 728 (1992) ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation"). This Court should prevent this from happening here and dismiss the indictment against Mr. Merlo-Espinal.

RESPECTFULLY SUBMITTED:      February 2, 2022.

JON M. SANDS
Federal Public Defender

*/s/ Jordan Perry Malka*
**JORDAN PERRY MALKA**
Assistant Federal Public Defender