JON M. SANDS
Federal Public Defender
**JORDAN PERRY MALKA**
IL State Bar No. 6321055
Jordan_Malka@fd.org
*Attorney for Defendant*
407 W. Congress St., Suite 501
Tucson, AZ  85701
Telephone:  (520) 879-7500

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR21-1720-TUC-CKJ (DTF) |
|---|---|
| Plaintiff, | **Objection to Report and Recommendation (doc. 29) to Defense's Motion to Dismiss the Indictment (doc. 15).** |
| vs. | |
| Reynel Ivan Merlo-Espinal, | |
| Defendant. | |

Defendant, Reynel Ivan Merlo-Espinal, by and through counsel, hereby objects to the Magistrate Court's Report and Recommendation.  The District Court should, after independently reviewing the briefs filed and the exhibits attached thereto, dismiss the indictment against Mr. Merlo-Espinal.

RESPECTFULLY SUBMITTED:        March 29, 2022.

JON M. SANDS
Federal Public Defender

*/s/ Jordan Perry Malka*
**JORDAN PERRY MALKA**
Assistant Federal Public Defender

1

**I. The District Court should apply the *Arlington Heights* standard, not the rational basis standard.**

The legal framework of *Arlington Heights* applies here. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1. The impact of the official action and whether it bears more heavily on one race than another;
2. The historical background of the decision;
3. The specific sequence of events leading to the challenged action;
4. The [legislature's] departures from normal procedures or substantive conclusions; and,
5. The relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted

2

even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

The District Court should consider the historical evidence submitted by the defense to the Magistrate Court (exhibits A through O); after, the District Court should find that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, and that § 1326 is ultimately presumptively unconstitutional under *Arlington Heights*.

**II.  The Magistrate Court was wrong – the Immigration and Nationality Act of 1952 and its subsequent amendments have not cleansed 8 U.S.C. § 1326 from its racist history.**

The original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952. The reenactments, however, do not cleanse the law of its racist past, and the District Court should find that Congress acted with a discriminatory intent when enacting § 1326.

In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an

excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted). Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.[1] But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint. Additionally, and contrary to the Magistrate Court's findings that § 1326 is rationally related to a legitimate governmental interest, laws enacted with a

---

[1] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision). Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*

### III. The Magistrate Court was wrong – § 1326 continues to disparately impact Mexican and other Latinx defendants.

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latinx defendants.

Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1326 today, the overwhelming number of Border Patrol arrests along the southern border are of Mexicans or people of Latinx origin. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005, Mexicans made up 86% of apprehensions, and in 2010, 87%.[2] In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups easily constitute the overwhelming majority of border crossers.[3] *See The*

---

[2] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[3] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

*Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (recognizing a disparate impact on Latinx people where the neighborhoods were "trending" Latinx during the relevant period).

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of Mexican or other Hispanic origin); *Community Improvement*, 583 F.3d at 704 (excluding 71% Latino areas from benefits, while extending those benefits to other areas that were only 48% Latino).

The executive branch continues to wield § 1326 as a tool of mass prosecution that disproportionately affects Mexicans and Latin Americans. In April 2018, then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[4] The following month, Sessions made clear at an address delivered in San Diego that "the Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up those cases."[5]

Both Sessions and Stephen Miller, a senior policy advisor to President Trump and the architect of the zero-tolerance policy,[6] have drawn inspiration from the discriminatory immigration laws of the 1920s. In a series of leaked emails, Miller lauded the immigration

---

[4] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at*: https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[5] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[6] *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

policies of this era, suggesting to a journalist, "This would seem a good opportunity to remind people about the heritage established by Calvin Coolidge, which covers four decades of the 20th century"—i.e., the decades between the 1924 Act and its repeal in 1965.[7] Likewise, in a 2015 interview with Breitbart, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that when immigration levels were "about this high in 1924," the President and Congress "changed the policy, and it slowed down immigration significantly."[8] He warned that repeal of those policies in 1965 had primed the country for a "surge fast past what the situation was in 1924."[9]

Further, the test for disparate impact only requires evidence that § 1326 "bear more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Additionally, the Magistrate Court's point that § 1326 has been used to incarcerate the Latinx community at a much higher rate than other communities simply because of the United States' geographic location to Mexico and Central America is not helpful to the overall analysis here. The over policing of the southern border (as opposed to the northern border with Canada) should not prevent a specific group of individuals from raising equal protection challenges. Moreover, under *Arlington Heights*, it is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it does overwhelmingly impact Mexican and Latino communities today.

Plus, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly- or trending-Latino neighborhoods have disparate impacts on Latino people, *The Comm. Concerning Commun.*

---

[7] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[8] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[9] *Id.*

7

*Improvement v. City of Modesto*, 583 F.3d 690, 704-06 (9th Cir. 2009); that educational decisions made with a racist purpose in a predominantly Latino city have a disparate impact on Latino students, *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015); and that voting decisions made with a racist purpose in a state where some American Indian, Latino, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities, *D.N.C. v. Hobbs*, 948 F.3d 989, 1004-06 (9th Cir. 2020) (en banc). If the "geography" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

This evidence demonstrates that § 1326 has disparately impacted Mexican and Latinx immigrants and continues to do so today. Combined with Mr. Merlo-Espinal's showing that racial discrimination was a "motivating factor" in its passage, he has satisfied his initial burden under *Arlington Heights* to demonstrate that the law violates equal protection.

**IV.   CONCLUSION**

The District Court should consider the record in its entirety and ultimately find that Mr. Merlo-Espinal has shown both a discriminatory purpose and a disparate impact underlying § 1326 and that the government failed to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor").

The District Court should reject the Magistrate Court's Report and Recommendation and, instead, dismiss the indictment against Mr. Merlo-Espinal.