GARY M RESTAINO
United States Attorney
District of Arizona
JACKSON STEPHENS
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
jackson.stephens@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | 21-CR-1720-TUC-CKJ-DTF |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTION TO THE REPORT AND RECOMMENDATION (ECF #33) |
| v. | |
| Reynel Ivan Merlo-Espinal, | |
| Defendant. | |

Now comes the United States of America, by and through its undersigned attorneys, Gary M. Restaino, United States Attorney for the District of Arizona, and Jackson Stephens, Assistant United States Attorneys, and hereby submits its response to the defendant's Motion to Dismiss (ECF #15). The Government respectfully requests that the Court deny his motion. The defendant's equal protection claim fails because Congress's plenary power over immigration affairs is subject to rational basis review. The illegal reentry law, which seeks to deter illegal immigration, passes muster. Accordingly, Merlo-Espinal's motion should be denied.

//

### I.     Factual Background

On June 26, 2021, the defendant was arrested in a remote area of the desert on the Organ Pipe Cactus National Monument in the state of Arizona. The defendant admitted to the arresting Border Patrol Agent that he had entered the United States illegally three days earlier. Further record checks using the defendants' fingerprints reflected that the defendant is a Honduran citizen who has been deported three times, most recently in 2015. There is no evidence to suggest the defendant is also a United States citizen. A criminal records check revealed that the defendant has previously been convicted of Driving Under the Influence (2006), Unauthorized Entry of an Inhabited Dwelling (2008), Sexual Battery (2008), and Illegal Entry by a Removed Alien (2013).

### II.    The Court Applied the Correct Standard: Rational Basis

The Magistrate Judge correctly decided that *Arlington Heights* does not apply in the context of 18 U.S.C. § 1326. First, as noted by the Court, two courts in this District have rejected similar, if not identical, claims. See *United States v. Zavala-Sanchez*, No. 2:21-CR-00334-GMS (D. Ariz. Sept. 16, 2021); *United States v. Gutierrez-Barba*, 2:19-CR-01224-DJH, 2021 WL 2138801, at *5 (D. Ariz. May 25, 2021). Only one court has granted a similar motion. See *United States v. Carrillo-Lopez*, 3:20-CR-00026-MMD-WGC, 2021 WL 3667330, at *25 (D. Nev. Aug. 18, 2021).

Moreover, the Ninth Circuit has held that rational basis is the correct standard for reviewing immigration statutes. In *Ledezma-Cosino v. Sessions*, the Ninth Circuit said, "we have consistently held ... that ordinary rational basis review is the appropriate standard in the immigration context. Our sister circuits agree. Because Petitioner's equal protection

fails under the ordinary rational basis test, this case provides no reason to question that longstanding approach." 857 F.3d 1042, 1049 (9th Cir. 2017) (*en banc*) (citations omitted). Six years earlier, in *Hernandez-Mancilla v. Holder*, the Ninth Circuit similarly instructed, "[w]e review equal protection challenges to federal immigration laws under the rational basis standard and uphold them if they are 'rationally related to a legitimate government purpose.' 'Using such rational-basis review, a statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" 633 F.3d 1182, 1185 (9th Cir. 2011) (citation omitted). Six years before that, in *Masnauskas v. Gonzales*, the Ninth Circuit explained, "[w]hen challenged under equal protection, 'line-drawing' decisions made by Congress ... in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose." 432 F.3d 1067, 1071 (9th Cir. 2005).

In *United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), the Ninth Circuit addressed congressional power to pass criminal statutes regulating immigration. The defendant had challenged congressional authority to enact the same statute challenged today: 8 U.S.C. § 1326. *Hernandez-Guerrero* held that "Congress possessed ample authority to enact § 1326 pursuant to its inherent immigration power." 147 F.3d at 1078. The Ninth Circuit explained that the clear purpose of § 1326 "is to deter aliens who have been forced to leave the United States from reentering the United States." *Id.* According to *Hernandez-Guerrero*, Congress had plenary authority to enact § 1326, noting that by "threatening with criminal prosecution any alien found in the United States who has

previously been 'excluded, deported, or removed,' Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." *Id.*

The text of § 1326 is race neutral. It makes no mention of race. It applies to aliens of any race. It does not distinguish between aliens. All previously deported aliens who enter, attempt to enter, or are found in the United States without permission are treated equally by the terms of the statute. *Hernandez-Guerrero* has already explained the rationale for § 1326, noting that by threatening criminal prosecution Congress sought to give teeth to immigration statutes and to ensure compliance with deportation orders. 147 F.3d at 1078.

Moreover, the harsher penalties apply only to returning aliens who have committed crimes within the United States, regardless of their race. This mechanism fosters public safety by discouraging proven criminals from entering the United States and incarcerating if they do enter, attempt to enter, or are found in the United States. The enhanced penalties for prior criminal convictions is entirely race-neutral on its face. Whether an alien in the country without permission commits another crime is entirely within the control of the individual, regardless of race. There is a rational basis for § 1326. Consequently, the application of § 1326 does not violate the notion of equal protection, as Defendant asserts in his motion to dismiss.

### III. The Pre-1952 History of 8 U.S.C. § 1326 is Irrelevant

Many courts have considered the legislative history of § 1326 and found the evidence of racial animus lacking. For example, in the recent case of *Munoz-De La O*, the court described in detail the history of § 1326 and its amendments. The court considered the same arguments made in this case about the legislative history. The court concluded that

the Defendant failed to meet the burden of demonstrating § 1326 was passed with an invidious discriminatory motivation. *Munoz-De La O*, 2022 U.S. District LEXIS 29868 at *34, 2022 WL 508892. *Munoz-De La O* further concluded, as have many other courts, that the five subsequent amendments to § 1326 were not enacted with discriminatory purpose. *Id.* at *37. The subsequent amendments to § 1326 "are justified by public safety considerations for criminal aliens with aggravated felony convictions." *Id.* at *39. And the court gave no ground to the suggestion that, once tainted with racial animus, a statute is forever tainted. *Id.* at *36-37.

### IV.   Disparate Impact is the Result of Geography

There is no doubt that § 1326 impacts Latinx defendants more than other racial groups. However, such an impact is a result of geography, rather than racism. In *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 554 F.Supp.3d 1114, 2021 U.S. Dist. LEXIS 151779 at *16, 2021 WL 3570229 (D. N.M. Aug. 12, 2021), the court agreed that "the proximity of a very large population of Hispanics to the Southern Border, as well the political and financial realities unique to Central America, fully explain the disproportionate number of Hispanics charged with violating § 1326."

Addressing the same statistics offered in this case, *United States v. Hernandez-Lopez* also accepted a race-neutral explanation for the impact of § 1326 on people from Mexico and Central America. 2022 U.S. Dist. LEXIS 18649, *17, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *see also United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 U.S. Dist. LEXIS 214071 at *8, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021) ("Although there is evidence that Mexican and Latinx[6] people make up the vast majority of individuals

apprehended at the border, there is no evidence that they are disproportionately represented in convictions for illegal reentry under 8 U.S.C. § 1326(a)."); *United States v. Wence*, No. 3:20-cr-0027, 2021 U.S. Dist. LEXIS 112805, at *29, 2021 WL 2463567 (D.V.I. June 16, 2021) ("[A]lthough Latinx people are likely disproportionately affected by 8 U.S.C. § 1326, the disparate impact alone in this case is not pronounced enough to give rise to an inference of discriminatory motive, given that the disparity is explainable on grounds other than race."). Section 1326 is more about the economics of agricultural labor, together with concern for public safety, than it is about racial discrimination. Dramatically higher wages paid to workers in the United States compel citizens of Mexico and Central America to cross the border to work to be able to provide income for themselves and their families. The economic opportunities are irresistible to some, despite being previously deported. Section 1326 is a mechanism that tends to protect the jobs and wages of agricultural workers who have complied with the immigration laws to achieve citizenship or permission to reside in the United States. It does so by punishing those who re-enter unlawfully and compete with citizens and lawful permanent residents or others holding permission, a problem pointed out by none other than the agricultural labor rights leader Cesar Chavez. The United States, a wealthy country which shares a roughly 2,000 mile border with a "poor" country, is undoubtedly a magnet for people from Mexico and beyond.

The chance to make a better living is a constant theme among defendants who have appeared before this Court on § 1326 charges. Many have family members who are citizens of, and reside in, the United States, and provide the attraction to re-enter illegally. The

reasons for illegal re-entry are colorblind and race neutral. The existence and enforcement of § 1326 is likewise colorblind and race neutral. The enhanced penalties of § 1326 for those with previous criminal convictions are also colorblind and race neutral. The impetus is the safety of the public. The enhanced penalties do not apply on the basis of race or suspected propensity for criminality, but upon an illegal re-entrant's actual past criminal actions. To make the obvious point, members of no race are born with criminal convictions. The individual who is convicted of a crime which may be unrelated to immigration laws, has demonstrated some proclivity towards crime. Of all the aliens who re-enter the United States without permission, the ones with criminal histories, irrespective of race, pose the most direct threat to public safety.

The defense surmises racist intent by pointing to public comments made by members of the Trump administration, including Attorney General Jeff Sessions and Senior Policy Advisor Stephen Miller in 2018.  The defense also references the Department of Justice's "zero-tolerance policy" as drawing inspiration from 1920's-era racism.  However, those remarks were made well after the 1952 passage of the Immigration and Naturalization Act. Interpreting those remarks as demonstrating the racist intent of the statute places the cart before the horse.

The legality of a "zero tolerance policy" during the Trump Administration is irrelevant to the Court's decision at hand.  The defendant has not alleged selective prosecution on the part of this defendant, nor is there any evidence that he would not have been prosecuted prior to 2018.  In fact, the defendant was prosecuted in 2011 and 2012 for violation § 1326, well before former President Trump was elected to high office.

### V. Conclusion

Because § 1326(a) and (b) is an immigration enforcement law, Ninth Circuit controlling authority requires the equal protection claim be scrutinized under the rational basis test. The law passes that test. Based on the above, the government respectfully requests that the Court deny the defendant's Motion as well as its Objections to the Report and Recommendation.

Respectfully submitted this 18th day of May, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Jackson A. Stephens*
JACKSON STEPHENS
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

All ECF Participants